# PHILADELPHIA COMPANY *v.* STIMSON, SECRETARY OF WAR.[1]

### APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 70. Argued November 16, 1911.—Decided March 4, 1912.

Exemption of the United States from suit does not protect its officers from personal liability to persons whose rights of property they have wrongfully invaded.

In case of injury threatened by illegal action, an officer of the United States cannot claim immunity from injunctive process.

Where complainant does not ask the court to interfere with an officer

---

[1] This case was originally commenced against William H. Taft as Secretary of War; by subsequent orders of the court the successive incumbents of that office, Luke E. Wright, Jacob M. Dickinson and Henry L. Stimson, were substituted as defendants and appellees.

of the United States acting within his official discretion, but challenges his authority to do the act complained of, the suit is not against the United States.

While the general rule is that equity has no jurisdiction over the prosecution of crimes, it may, when it is essential to the protection of property rights, as to which the protection of a court of equity has already been invoked, enjoin the institution of criminal actions involving the same legal questions.

An officer transcending the limits of his authority under a constitutional statute may inflict similar injuries on property or individuals as though he were proceeding under an unconstitutional statute, and in either event, equity may intervene to restrain unfounded prosecutions.

A court of equity having control of the person of defendant has jurisdiction of an action to restrain him from violating the rights of the complainant in regard to property not within its jurisdiction and may compel obedience to its decree. *Phelps v. McDonald*, 99 U. S. 298.

While the establishment of a general system of harbor lines for the protection of navigation is not of itself an injury to property and cannot be restrained, equity may enjoin an officer from taking measures to maintain the limits against an individual proprietor and so prevent him from enjoying what he asserts to be a lawful use of his own property.

A riparian proprietor of land bounded by a stream continues to hold to the stream as a boundary where the banks are changed by accretion or erosion, but if the banks are changed by avulsion, the title is not changed but remains at the former line. This rule applies alike to all streams and rivers no matter how strong and swift they may be.

To bring a sudden change of channel within the rule that it will not affect the boundary line, it must be perceptible when it takes place. *Nebraska v. Iowa*, 143 U. S. 359.

In this case, *held*, that the changes in the line of complainant's property were due to gradual erosion and not to sudden change of channel, and that the stream remained the boundary line.

The title to the soil under navigable waters within their territorial limits, and the extent of riparian rights, are governed by the law of the several States subject to the paramount authority of Congress; and under the authority of Congress, the Secretary of War may fix harbor lines superseding those fixed by the State.

Commerce includes navigation; *Gilman v. Philadelphia*, 3 Wall. 713;

and the power of Congress over navigation has no limits except those prescribed in the Constitution.  *Gibbons* v. *Ogden,* 9 Wheat. 1, 196.

The authority of Congress is not limited to water as it flowed at any preceding time.  Alterations in the course of a stream do not affect the power of Congress.

The public right of navigation follows the course of the stream.

It is for Congress to decide what shall or shall not be deemed in judgment of law an obstruction to navigation.  *Pennsylvania* v. *Wheeling Bridge Co.,* 18 How. 421.

Authority given by Congress to the Secretary of War to establish harbor lines is not exhausted in laying the lines once; the Secretary may change them at subsequent times in order to protect navigation from obstruction.

33 App. D. C. 338, affirmed.

THE facts, which involve the construction and constitutionality of acts of Congress giving the Secretary of War power to establish harbor lines in navigable waters of the United States, and the validity and effect of the action of the Secretary of War thereunder in regard to harbor lines established by him in the harbor of Pittsburgh, Pennsylvania, are stated in the opinion.

*Mr. William L. Marbury,* with whom *Mr. Morgan H. Beach, Mr. W. Graham Bowdoin* and *Mr. Samuel McClay* were on the brief, for appellant:

It was manifestly in the interest of navigation, as well as for the protection of riparian owners, that the legislature of Pennsylvania enacted Chapter 363 of the Acts of 1858, to establish high and low water lines in the Allegheny, Monongahela and Ohio rivers, in the vicinity of Pittsburgh, in Allegheny County.

The effect of this act and of the proceedings so taken thereunder was to secure to the owners of land along these rivers complete protection against any loss of their land or right to build upon the same because of any subsequent encroachment of the waters.  *Bridge Co.* v. *Pfeil,* 42 Pitts. Leg. Jour. 18.

Rights of riparian owners on navigable waters, including the question of how far, if at all, their title to land shall be deemed to be affected by the action of the water, are determined and governed by the laws of the respective States. *Shively* v. *Bowlby*, 152 U. S. 1; *Barney* v. *Keokuk*, 94 U. S. 324; *St. Louis* v. *Meyers*, 113 U. S. 566; *Water Power Co.* v. *Water Commissioners*, 168 U. S. 349; *Packer* v. *Bird*, 137 U. S. 661.

In Pennsylvania the soil up to low-water mark in a navigable stream is the property of the Commonwealth. *Monongahela Bridge Co.* v. *Kirk*, 46 Pa. St. 112, 120.

Even if the overflowing of the complainant's property caused by the construction by the Government in improving the harbor might be *damnum absque injuria*, the owner of the property has the right to protect himself against such injury, if he can, at his own expense, either by excluding or expelling the water. *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 336.

But, even though the Pennsylvania act of 1858 had never been passed, upon the facts appearing in this case the title of the plaintiff as the owner of Brunot's Island to the submerged land lying inside islandward of the commissioners' line of 1865 remains absolute.

If the waters of the river had encroached gradually and by imperceptible degrees upon the island, as it existed in 1865, so that the land now in dispute gradually became part of the bed of the river covered with navigable water, in the absence of any such statute as the act of 1858 above quoted, the owner of Brunot's Island would have lost title to the land thus submerged and the same would have become the property of the State or of the municipality.

But, when as here, instead of the submergence or loss of land being caused by the gradual and imperceptible encroachment of the water, it is caused by sudden floods and freshets, the title of the owner of the island is not affected and he may at any time exclude the water or occupy

the land itself submerged in any way he pleases. *Rex* v. *Lord Yarborough*, 3 Barn. & C. 15; Angell, Tidewaters, 1st ed., 71; *Emans* v. *Turnbull*, 2 Johns. 314; *S. C.*, 3 Am. Dec. 427; 2 Bl. Com. 261; Hargrave's Law Tracts, 28; Gould on Waters, § 158 and cases cited; *Mulry* v. *Norton*, 100 N. Y. 424, citing Hargrave's Law Tracts (Matthew Hale's De Jure Maris, 36–37); Cooke & Foster, M. 7 Jac. C. B.; *Morris* v. *Brooks*, decided by the Court of Common Pleas of Delaware; *Wallace* v. *Driver*, 31 L. R. A. (Ark.) 319; Hunt on Boundaries, &c. 29.

So that the washing away by freshets of the surface of the soil of Brunot's Island inside of the commissioners' line of 1865, which is admitted to be located upon what was the actual high-water mark at that time, has made no alteration in the boundary of the island. That boundary still remains where it was at that time, to wit, on the commissioners' line of 1865. *St. Louis* v. *Rutz*, 138 U. S. 226, 245. See also *Nebraska* v. *Iowa*, 145 U. S. 519; *Widdecombe* v. *Rosemiller*, 118 Fed. Rep. 295.

This proceeding is "not virtually a suit against the United States," but a suit to restrain the defendant, an executive officer of the Federal Government, from exceeding his authority to the impairment of the property rights of the claimant. *United States* v. *Lee*, 106 U. S. 218, 219; *Noble* v. *Union River Logging Railroad*, 147 U. S. 171; *School of Magnetic Healing* v. *McAnnulty*, 187 U. S. 108; *Scott* v. *Donald*, 165 U. S. 112; *In re Tyler*, 149 U. S. 164; *Osborn* v. *Bank of the United States*, 9 Wheat. 842; *New Orleans* v. *Paine*, 147 U. S. 264; *Louisiana State Lottery Co.* v. *Fitzpatrick*, 15 Fed. Cas. 986.

A court of equity will entertain a bill to restrain the institution and prosecution of criminal proceedings, as threatened in this case, for the reason that such prosecution would interfere with, and, in effect destroy, the property rights of the complainant in the land in question. Because in fact the prosecution of such proceedings would

entirely deprive plaintiff of the use of its property and constitute such a taking of private property for public uses as a court of equity will always enjoin. *Davis & Farnum Mfg. Co.* v. *Los Angeles,* 189 U. S. 207; *Central Trust Co.* v. *Citizens' Street Railway Co.,* 80 Fed. Rep. 225; *Louisiana State Lottery Co.* v. *Fitzpatrick,* 15 Fed. Cases, 986; *Dobbins* v. *Los Angeles,* 195 U. S. 241; *City of Hutchinson* v. *Beckham,* 118 Fed. Rep. 401; *Greenwich Ins. Co.* v. *Carroll,* 125 Fed. Rep. 126; *Frewin* v. *Lewis,* 4 Mylne & Craig, 249; *Baltimore* v. *Radeke,* 48 Maryland, 217; *Georgia R. R. Co.* v. *Atlanta,* 118 Georgia, 490; Lewis on Eminent Domain, par. 56; *Osborne* v. *Missouri Pac. Ry. Co.,* 147 U. S. 258, 259; *Eaton* v. *B. C. & M. R. R. Co.,* 51 N. H. 511–512.

Complainant does not contend that the mere establishing of the harbor lines complained of, and the requiring of the plat in the office of the Secretary of War, unaccompanied by the taking of any active measures on the part of the defendant to actually interfere with the complainant in the use of its property, would have furnished sufficient ground for the interference of a court of equity, as by injunction, as the mere establishing of harbor lines unaccompanied by any such action does not constitute such a cloud upon the complainant's title to his land or such invasion of his rights as would justify such relief. But the facts of this case at bar are exactly the reverse of the facts of *Yesler* v. *Washington Harbor Line Commissioners,* 146 U. S. 646, 656, and *Prosser* v. *N. P. Ry. Co.,* 152 U. S. 59.

The fact that the land of the plaintiff of which the defendant is depriving the plaintiff the possession by threatening it with criminal prosecution if it uses said land— which in other words the defendant is attempting to take without compensation—is not located in the District of Columbia, does not deprive the Supreme Court of the District of jurisdiction. *Stone* v. *United States,* 167 U. S.

169; *Cole* v. *Cunningham,* 133 U. S. 107; *Phelps* v. *Mc-Donald,* 99 U. S. 298.

*Mr. Assistant Attorney General Knaebel* for appellee:

The harbor line was lawfully established.

As riparian owner with or without the fee of the river bed, the appellant is in no position to complain of the new harbor line. No "taking" of property is involved in the incidental losses which result to such an owner from the exercise by Congress of its paramount power to improve and protect navigation. The navigable waters are the public property of the nation, and subject to all the requisite legislation by Congress. *Gilman* v. *Philadelphia,* 3 Wall. 725; *South Carolina* v. *Georgia,* 93 U. S. 4, 11; *Mobile* v. *Kimball,* 102 U. S. 691, 697; *Gibson* v. *United States,* 166 U. S. 269; *Scranton* v. *Wheeler,* 57 Fed. Rep. 803; *S. C.,* 179 U. S. 141; *Hawkins Point Light-House Case,* 39 Fed. Rep. 77; *United States* v. *Rio Grande Dam &c. Co.,* 174 U. S. 690, 708; *Union Bridge Company* v. *United States,* 204 U. S. 364, 400. A permission granted by the State years ago, but not acted on, cannot survive in the face of a sweeping policy of Congress.

The bill does not exhibit facts sufficient to show that the change in this instance was one of avulsion or submergence.

There is no allegation that the change occurred perceptibly. *Jefferis Case,* 134 U. S. 178. The rapidity with which floods and freshets wore away the bank, if they wore it at all, would depend upon a variety of physical conditions. They might wear rapidly, or gradually, or not at all; they might well add to instead of subtracting from the soil. The law is concerned only with the degree of speed with which the diminution takes place, but as to this the bill is wholly silent.

The difference between the processes is found in the fact that the operation of the one is sudden and its results

perceptible in their progress, while the other operates so gradually that the eye does not observe the inward movement of the water. *County of St. Clair* v. *Lovingston*, 23 Wall. 46, 47; *Jefferis* v. *East Omaha Land Co.*, 134 U. S. 178; *Nebraska* v. *Iowa*, 143 U. S. 359, 361..

Admitting that the change was by a process akin to avulsion, and conceding freely the power of the State to do away with the common law of accretion and erosion entirely, and establish a permanent boundary for the plaintiff's land, that has nothing to do with the matter of protecting navigation. So far as the General Government is concerned, appellant is simply in the position of a riparian proprietor, owning the fee as far out as the Commissioners' line, subject to have his use of it regulated in the interest of commerce under the authority of Congress. ·

The court was without jurisdiction. *Boston &c. Mining Co.* v. *Montana Ore Co.*, 188 U. S. 632, 639; *Dredging Co.* v. *Morton*, 28 App. D. C. 288. The suit cannot possibly be other than a suit against the United States. *Prosser* v. *Northern Pacific Railroad*, 152 U. S. 59; *Yesler* v. *Washington Harbor Line Commissioners*, 146 U. S. 646; *S. C., sub nom. Board of Harbor Line Commissioners* v. *State*, 2 Washington, 530; 27 Pac. Rep. 550; *Harkrader* v. *Wadley*, 172 U. S. 148, 169; *Ex parte Young*, 209 U. S. 203, distinguished; and see *Fitts* v. *McGhee*, 172 U. S. 516.

The suit, therefore, is in effect a suit against the United States. *Minnesota* v. *Hitchcock*, 185 U. S. 386; *Board* v. *McComb*, 92 U. S. 531; *Oregon* v. *Hitchcock*, 202 U. S. 60. It is, a palpable attempt to prejudge the merits of a criminal prosecution which the Attorney General would have a perfect right, and, indeed, would be under a duty, to institute if, in his best judgment, he should conclude that the harbor line was lawfully established.

The case is also clearly not such a suit as ought to be entertained by the court as a court of equity. It is objectionable from this standpoint in the first place as a

pure attempt to enjoin valid criminal proceedings. *In re Sawyer*, 124 U. S. 200, 209, 210; *Harkrader v. Wadley*, 172 U. S. 148, 170; *Fitts* v. *McGhee, supra*.

Furthermore, only one punishment would be involved under the act of 1899 by the construction of the wharf beyond the harbor line. In that respect also the case differs greatly from the *Young Case*. There could be no multiplicity of prosecutions or cumulation of drastic penalties. Neither does it appear that great and irreparable loss will result from delaying the construction of the proposed wharf.

The harbor line produces no cloud upon the title and does not for any other reason afford a ground of equitable interference, as was fully determined by this court in *Prosser* v. *Northern Pacific Railroad Company, supra*.

MR. JUSTICE HUGHES delivered the opinion of the court.

This suit was brought in the Supreme Court of the District of Columbia to set aside certain harbor lines in the harbor of Pittsburgh, Pennsylvania, so far as they encroached upon land owned by the complainant, and to restrain the Secretary of War from causing criminal proceedings to be instituted against the complainant because of the reclamation and occupation of its land outside the prescribed limits. The Court of Appeals of the District affirmed a decree sustaining a demurrer to the bill, and the complainant appeals.

The allegations of the bill, in substance, are as follows:

The complainant, a corporation of the Commonwealth of Pennsylvania, is the owner in fee of "Brunot's Island," formerly Chartier's or Hamilton's Island, in the Ohio River, in Allegheny County, Pennsylvania. In 1858, a statute was enacted in Pennsylvania providing for the appointment of commissioners to ascertain and mark the

lines of ordinary high and low water in the Allegheny, Monongahela and Ohio rivers in the vicinity of Pittsburgh. The act recited that the lines of land along the shores of the rivers had not been clearly ascertained, and it was important to all persons interested that their several rights and privileges should be defined. After the Commissioners' surveys had been completed and the lines located, opportunity was to be afforded in the court, by which they were appointed, for any needed corrections; and the map or plan finally determined upon was to be recorded. The statute declared that "the lines so approved shall forever after be deemed, adjudged and taken firm and stable for the purposes aforesaid." Proceedings were had accordingly and the high and low-water lines along the shore of Brunot's Island were definitely fixed. In consequence the bill asserts that all the land, whether or not under water, inside of the Commissioners' lines became the property of the owners of Brunot's Island; and that by virtue of the statute, and the action of the Commissioners under it in fixing the high-water line as a permanent boundary, the right of the owners of the island to accretions beyond that line was taken away, while at the same time they were no longer subject to loss or diminution of their land by reason of its submergence "through the avulsion of floods or freshets or through gradual erosion."

Subsequent to the establishment, in 1865, of the State Commissioners' line, a considerable portion of the shore of the island, "on the so-called back channel, within the said high water. mark," was washed away from time to time by heavy floods and freshets, so that a large part of the upland was slightly submerged, but not to an extent sufficient to permit of navigation. Some years ago, the United States Government, in order to increase the depth of water in the harbor of Pittsburgh, caused a dam to be constructed across the Ohio River a short distance below Brunot's Island, known as the Davis Island Dam. And

the effect of this dam, says the bill, by the increase of the depth of water in the channel, was to submerge Brunot's Island to a far greater extent and to make the water over the complainant's land navigable "at certain times, and for certain purposes," where it was not navigable before.

In 1895, the Secretary of War, claiming to act under the authority of § 12 of the act of Congress of September 19, 1890, and knowing that the shore of Brunot's Island had been washed away by floods and freshets, established a harbor line which ran across the complainant's land within the line of the State Commissioners. It is further alleged that although the submerged land was generally covered by water, "it was not ordinarily navigable water," and "has never constituted, nor does it now constitute a part of the public navigable waters of the United States;" that no authority was conferred by the act of Congress upon the Secretary of War to regulate or interfere with the use of the complainant's land by the establishment of harbor lines upon the same; and that even if the water over this land was in fact part of the public navigable waters of the United States, without being rendered thus navigable by the construction of the dam, still the Secretary of War had no right so to run the harbor line over the land in question as to deprive the complainant of its use and enjoyment. It was the right of the complainant, the bill avers, to repair the damage caused by floods and freshets and to reclaim the submerged portion by filling in or wharfing, "keeping at all times within the lines of the part that had been torn away by the violence of the waters."

In 1907, the Secretary of War, claiming authority under § 11 of the act of Congress of March 3, 1899, against the complainant's protest, changed the harbor line. The report of the United State engineer at Pittsburgh stated that the conditions of high and low water had not changed since 1895, but as along a part of the shore of the island,

the harbor line of 1895 ran several hundred feet outside high-water mark as it then existed, it seemed advisable to change it so as to coincide with the actual high-water mark. A copy of the report with the order of the Secretary of War, dated February 23, 1907, was annexed to the bill and made a part of it. In this it is stated that the location of the proposed harbor lines was within the bed of the stream as it existed as a physical fact.

The bill further shows that to facilitate the delivery of coal for the operation of its power house on the island, the complainant desired to reclaim a part of it which had been submerged by establishing a coal wharf on the back channel, where both the harbor line of 1895 and that of 1907 "ran some distance landward of the said State commissioners' high water line." According to the proposed plans, the wharf or pier was to extend over the complainant's land and to cross both of the harbor lines to the State commissioners' line. While these plans were being perfected, the Secretary of War, through his representative, the United States engineer officer at Pittsburgh, declared to the complainant that it had no right to build upon its land across either of the harbor lines, and he refused to permit the complainant to reclaim its land or to build its wharf thereon outside the harbor line of 1907. He threatened that if it undertook to do so, he would prevent it and cause the complainant and its employés "to be prosecuted and fined by the authorities of the Federal Government" for violations of the acts of Congress of September 19, 1890 (26 Stat. 426, c. 907), and March 3, 1899 (30 Stat. 1151, c. 425). It was further charged that if the Secretary of War had authority to fix the original harbor line of 1895, that his power was exhausted by what was then done, and that the harbor line of 1907 was wholly unauthorized.

In consequence of the severe penalties prescribed by the acts of Congress for the construction of buildings,

piers or wharves outside any harbor line established by the Secretary of War and by reason of the defendant's threats of prosecution in case the complainant carried out its plan of reclamation and the construction of its wharf, the bill avers that the complainant is prevented from making use of its property; that the defendant's action constitutes a taking of its property for public use without just compensation; that it is subjected in its endeavor, so long as the harbor line remains unmodified, to a multiplicity of criminal prosecutions; and that the harbor line is a cloud upon its title.

The provisions of the acts of Congress, referred to in the bill, are set forth in the margin.[1]

---

[1] Section 12 of the act of September 19, 1890; (Chap. 907, 26 Stat. 426, 455), provided:

"SEC. 12. That section twelve of the river and harbor act of August eleventh, eighteen hundred and eighty-eight, be amended and re-enacted so as to read as follows:

"Where it is made manifest to the Secretary of War that the establishment of harbor-lines is essential to the preservation and protection of harbors, he may, and is hereby authorized, to cause such lines to be established, beyond which no piers, wharves, bulk-heads or other works shall be extended or deposits made, except under such regulations as may be prescribed from time to time by him; and any person who shall willfully violate the provisions of this section, or any rule or regulation made by the Secretary of War in pursuance of this section, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine not exceeding one thousand dollars, or imprisonment not exceeding one year, at the discretion of the court for each offense."

Sections 11, 12 and 17 of the act of March 3, 1899, (Chap. 425, 30 Stat. 1121, 1151–1153), are as follows:

"SEC. 11. That where it is made manifest to the Secretary of War that the establishment of harbor lines is essential to the preservation and protection of harbors he may, and is hereby, authorized to cause such lines to be established, beyond which no piers, wharves, bulk-heads, or other works shall be extended or deposits made, except under such regulations as may be prescribed from time to time by him: *Provided,* That whenever the Secretary of War grants to any person or

In demurring to the bill the defendant asserted that it was bad in substance, and also specially assigned the following grounds,

"1. This proceeding is virtually a suit against the United States.

"2. This Court has no jurisdiction to restrain the enforcement of a penalty or prosecution for violation of law.

"3. This Court has no jurisdiction to restrain the defendant from instituting criminal proceedings against complainant.

"4. This Court has no jurisdicion to declare or define harbor lines or boundary lines of land outside the District of Columbia and in the State of Pennsylvania.

---

persons permission to extend piers, wharves, bulkheads, or other works, or to make deposits in any tidal harbor or river of the United States beyond any harbor lines established under authority of the United States, he shall cause to be ascertained the amount of tide water displaced by any such structure or by any such deposits, and he shall, if he deem it necessary, require the parties to whom the permission is given to make compensation for such displacement either by excavating in some part of the harbor, including tide-water channels between high and low water mark, to such an extent as to create a basin for as much tide water as may be displaced by such structure or by such deposits, or in any other mode that may be satisfactory to him.

"Sec. 12. That every person and every corporation that shall violate any of the provisions of sections nine, ten, and eleven of this Act, or any rule or regulation made by the Secretary of War in pursuance of the provisions of the said section fourteen, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding twenty-five hundred dollars nor less than five hundred dollars, or by imprisonment (in the case of a natural person) not exceeding one year, or by both such punishments, in the discretion of the court. And further, the removal of any structures or parts of structures erected in violation of the provisions of the said sections may be enforced by the injunction of any circuit court exercising jurisdiction in any district in which such structures may exist, and proper proceedings to this end may be instituted under the direction of the Attorney-General of the United States.

"Sec. 17. That the Department of Justice shall conduct the legal

"5. There is no jurisdiction in this Court to pass any decree removing cloud upon an alleged title of complainant in realty in the State of Pennsylvania,. nor to accomplish the same by declaring the harbor lines referred to in the bill null and void."

First. If the conduct of the defendant constitutes an unwarrantable interference with property of the .complainant, its resort to equity for protection is not to be defeated upon the ground that the suit is one against the United States. The exemption of the United States from suit does not protect its officers from.personal liability to persons whose rights of property they have wrongfully

---

proceedings necessary to enforce the foregoing provisions of sections nine to sixteen, inclusive, of this Act; and it shall be the duty of district attorneys of the United States to vigorously prosecute all offenders against the same whenever requested to do so by the Secretary of War or by any of the officials hereinafter designated, and it shall furthermore be the duty of said district attorneys to report to the Attorney-General of the United States the action taken by him against offenders so reported, and a transcript of such reports shall be transmitted to the Secretary of War by the Attorney-General; and for the better enforcement of the said provisions and to facilitate the detection and bringing to punishment of such offenders, the officers and agents of the United States in charge of river and harbor improvements, and the assistant engineers and inspectors employed under them by authority of the Secretary of War, and the United States collectors of customs and other revenue officers, shall have power and authority to swear out process and to arrest and take into custody, with or without process, any person or persons who may commit any of the acts or offenses prohibited by the aforesaid sections of this Act, or who may violate any of the provisions of the same: *Provided,* That no person shall be arrested without process for any offense not committed in the presence of some one of the aforesaid officials: *And provided further,* That whenever any arrest is made under the provisions of this Act, the persons so arrested shall be brought forthwith before a commissioner, judge, or court of the United States for examination of the offenses alleged against him; and such commissioner, judge, or court shall proceed in respect thereto as authorized by law in·case of crimes against the United States."

invaded. *Little* v. *Barreme*, 2 Cranch, 170; *United States* v. *Lee*, 106 U. S. 196, 220, 221; *Belknap* v. *Schild*, 161 U. S. 10, 18; *Tindal* v. *Wesley*, 167 U. S. 204; *Scranton* v. *Wheeler*, 179 U. S. 141, 152. And in case of an injury threatened by his illegal action, the officer cannot claim immunity from injunction process. The principle has frequently been applied with respect to state officers seeking to enforce unconstitutional enactments. *Osborn* v. *Bank of United States*, 9 Wheat. 738, 843, 868; *Davis* v. *Gray*, 16 Wall. 203; *Pennoyer* v. *McConnaughy*, 140 U. S. 1, 10; *Scott* v. *Donald*, 165 U. S. 107, 112; *Smyth* v. *Ames*, 169 U. S. 466; *Ex parte Young*, 209 U. S. 123, 159, 160; *Ludwig* v. *Western Union Telegraph Co.*, 216 U. S. 146; *Herndon* v. *C., R. I. & P. Ry. Co.*, 218 U. S. 135, 155; *Hopkins* v. *Clemson College*, 221 U. S. 636, 643–645. And it is equally applicable to a Federal officer acting in excess of his authority or under an authority not validly conferred. *Noble* v. *Union River Logging R. R. Co.*, 147 U. S. 165, 171, 172; *School of Magnetic Healing* v. *McAnnulty*, 187 U. S. 94.

The complainant did not ask the court to interfere with the official discretion of the Secretary of War, but challenged his authority to do the things of which complaint was made. The suit rests upon the charge of abuse of power, and its merits must be determined accordingly; it is not a suit against the United States.

Second. The second and third grounds of demurrer, specially stated, raise the question as to the jurisdiction of the court to restrain the defendant from instituting criminal proceedings.

A court of equity, said this court in *In re Sawyer*, 124 U. S. 200, 210, "has no jurisdiction over the prosecution, the punishment or the pardon of crimes or misdemeanors. . . . To assume such a jurisdiction, or to sustain a bill in equity to restrain or relieve against proceedings for the punishment of offenses, . . . is to invade

the domain of the courts of common law, or of the execu-
tive and administrative department of the government."
*Harkrader* v. *Wadley,* 172 U. S. 148, 170; *Fitts* v. *McGhee,*
172 U. S. 516, 531; 2 Story's Eq. Jur., § 893. But a dis-
tinction obtains when it is found to be essential to, the
protection of the property rights, as to which the jurisdic-
tion of a court of equity has been invoked,, that it should
restrain the defendant from instituting criminal actions
involving the same legal questions. This is illustrated
in the decisions of this court in which officers have been
enjoined from bringing criminal proceedings to compel
obedience to unconstitutional requirements. *Davis &
Farnum Mfg. Co.* v. *Los Angeles,* 189 U. S. 207, 217, 218;
*Dobbins* v. *Los Angeles,* 195 U. S. 223, 241; *Ex parte
Young,* 209 U. S. 123, 161, 162; *Western Union Telegraph
Co.* v. *Andrews,* 216 U. S. 165. In this, there is no at-
tempt to restrain a court from trying persons charged
with crime, or the grand jury from the exercise of its
functions, but the injunction binds the defendant not to
resort to criminal procedure to enforce illegal demands.

It is urged that the statute authorizing the Secretary of
War to prevent encroachments upon navigable streams is
a valid one, and that the decisions cited do not apply.
The validity of the statute is not attacked, because of the
assumption that it is not to be construed to contemplate
or authorize the alleged deprivation of property. Where
the officer is proceeding under an unconstitutional act, its
invalidity suffices to show that he is without authority,
and it is this absence of lawful power and his abuse of au-
thority in imposing or enforcing in the name of the State
unwarrantable exactions or restrictions, to the irreparable
loss of the complainant, which is the basis of the decree.
*Ex parte Young,* 209 U. S. p. 159. And a similar injury may
be inflicted, and there may exist ground for equitable
relief, when an officer, insisting that he has the warrant
of the statute, is transcending its bounds, and thus un-

lawfully assuming to exercise the power of government against the individual owner, is guilty of an invasion of private property.

By § 12 of the act of March 3, 1899 (30 Stat. 1151, c. 425), it was provided that every person and every corporation which should violate any provision of § 11, relating to the observance of harbor lines, or any rule or regulation made by the Secretary of War in pursuance of that section, should be guilty of a misdemeanor and punished by fine or imprisonment. By § 17 it was made the duty of district attorneys of the United States to prosecute all offenders whenever requested by the Secretary of War. If the complainant's rights, as against the defendant, were as claimed, it was entitled to adequate protection. And, in such case, the remedy might properly embrace the restraining of unfounded prosecutions.

Third. The fourth and fifth special grounds of demurrer assert that the Supreme Court of the District of Columbia had no jurisdiction to define boundaries in the State of Pennsylvania, or to remove a cloud upon title to land in that State.

In dealing with these objections, it is important to observe the precise nature of the suit. It was not to determine a controversy as between conflicting claimants under the local law. It was not to restrain trespass. *Northern Indiana R. R. Co.* v. *Michigan Central R. R. Co.*, 15 How. 233; *Ellenwood* v. *Marietta Chair Co.*, 158 U. S. 105. It was not brought to try the naked question of the title to the land. *Massie* v. *Watts*, 6 Cranch, 148, 158. While the complainant's title lay at the foundation of the suit, and it would be necessary for the complainant to prove it, if denied, still if its title to the land under water were established or admitted to be as alleged, the question would remain whether the defendant in imposing restrictions upon the use of the property was acting by virtue of authority validly conferred by a general act of

Congress. This was the principal question which the complainant sought to have determined. The defendant is within the District, amenable to the process of the court. There is no ground upon which it may be denied jurisdiction to decide whether he should be restrained from continuing his opposition to the complainant's plan of improvement. Rather should it be said that the case falls within the general rule sustaining the jurisdiction of a court of equity which has control of. the person of the defendant and may compel obedience to its decree. *Phelps* v. *McDonald,* 99 U. S. 298, 308.

Fourth. Assuming that the court had jurisdiction, we are brought to a consideration of the equity of the bill.

It has been held that the establishment of a general system of harbor lines, for the protection of commerce and navigation, is not of itself an injury to property and cannot be restrained. *Yesler* v. *Washington Harbor Line Commissioners,* 146 U. S. 646, 656; *Prosser* v. *Northern Pacific R. R. Co.,* 152 U. S. 59, 64, 65. But it has also been recognized that a different question arises when active measures are taken against an. individual proprietor to maintain a location of limits in alleged violation of his private rights and thus to prevent him from enjoying what is asserted to be the lawful use of his property. *Prosser* v. *Northern Pacific R. R. Co., supra.*

The complainant starts with the lines as laid down, in 1865, by the State Commissioners. These lines are averred to be "exactly in accordance with the then existing actual ordinary high and low water marks." The argument is (1) that, independently of the effect of the. statute of Pennsylvania, the washing away of the banks, and the submergence of a portion of the island, during the subsequent years worked no loss of title, but that it remained absolute, including the right of reclamation and improvement of the submerged land inside the former line. of high water; and (2) that, by virtue of the statute, the

boundary was permanently fixed by the State Commissioners' high-water line and no subsequent encroachment of the water could affect the rights of the owner.

(1) It is the established rule that a riparian proprietor of land bounded by a stream, the banks of which are changed by the gradual and imperceptible process of accretion or erosion, continues to hold to the stream as his boundary; if his land is increased he is not accountable for the gain, and if it is diminished he has no recourse for the loss. But where a stream suddenly and perceptibly abandons its old channel, the title is not affected and the boundary remains at the former line. *Rex* v. *Yarborough,* 3 B. & C. 91; *S. C.,* 2 Bligh, N. S. 147; *Gifford* v. *Yarborough,* 5 Bing. 163; *New Orleans* v. *United States,* 10 Pet. 662, 717; *Banks* v. *Ogden,* 2 Wall. 57; *County of St. Clair* v. *Lovingston,* 23 Wall. 46, 67, 68; *Jefferis* v. *East Omaha Land Co.,* 134 U. S. 178, 190–193; *St. Louis* v. *Rutz,* 138 U. S. 226, 245; *Nebraska* v. *Iowa,* 143 U. S. 359; *Shively* v. *Bowlby,* 152 U. S. 1, 35; Hale, *De Jure Maris,* Ch. 1, 4, 6, Hargrave's Law Tracts; *Mulry* v. *Norton,* 100 N. Y. 424. The doctrine that the owner takes the risk of the increase or diminution of his land by the action of the water applies as well to rivers that are strong and swift, to those that overflow their banks, and whether or not dykes and other defenses are necessary to keep the water within its proper limits. It is when the change in the stream is sudden, or violent, and visible, that the title remains the same. It is not enough that the change may be discerned by comparison at two distinct points of time. It must be perceptible when it takes place. "The test as to what is gradual and imperceptible in the sense of the rule is, that though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on." *County of St. Clair* v. *Lovingston, supra* (p. 68).

We are confined to the allegations of the bill. We have

not the advantage of proof and findings, or even of a particularized description in the bill itself, as to the precise character of the alterations in the banks of Brunot's Island which took place during the long period to which the bill refers. It is alleged "that subsequent to the establishment in 1865 by said Commissioners of the line of high water mark, as aforesaid, a considerable amount of the soil of the shore of said Brunot's Island on the so-called back channel, within the said high water mark was washed away from time to time by heavy floods and freshets, so that a large part of the upland of the island, that is the land above high water mark, became and was overflowed and slightly submerged by water, but said land was not submerged to an extent sufficient to permit of navigation of any kind thereover." There is no other statement on the point save that the bill asserts that the complainant was entitled to reclaim "keeping at all times within the lines of the part that had been torn away by the violence of the waters."

It is manifest that these allegations are inadequate to support the complainant's contention. The determining words are that the land was "washed away from time to time by heavy floods and freshets," and the reference is to what occurred in many years. This is far from a statement that at any particular time there was such a sudden, violent, and visible change as to justify a departure from the ordinary rule which governs accretion and diminution albeit the stream suffer wide fluctuations in volume, the current be swift, and the banks afford slight resistance to encroachment.

For example, the general principle of accretion, which has that of diminution as its correlative, applies to such rivers as the Mississippi and the Missouri, notwithstanding the extent and rapidity of the changes constantly effected. *Jefferis* v. *East Omaha Land Co., supra; Jones* v. *Soulard,* 24 How. 41; *Saulet* v. *Shepherd,* 4 Wall. 502;

*County of St. Clair* v. *Lovingston, supra; St. Louis* v. *Rutz,
supra.* In *Nebraska* v. *Iowa, supra,* the question concerned
the boundary between the two States, which, by the acts
of admission, was the middle of the main channel of the
Missouri River. Between 1851 and 1877, in the vicinity
of Omaha, there were marked changes in the course of
this channel so that in the latter year it occupied a very
different bed from that through which it flowed in the
former year. The opinion of the court describes in detail
the physical conditions along the river. The court said
(pp. 368–370): "The current is rapid, far above the aver-
age of ordinary rivers; and by reason of the snows in the
mountains there are two well known rises in the volume
of its waters, known as the April and June rises. The
large volume of water pouring down at the time of these
rises, with the rapidity of its current, has great and rapid
action upon the loose soil of its banks. . . . The
only thing which distinguishes this river from other
streams, in the matter of accretion, is in the rapidity of
the change caused by the velocity of the current; and this
in itself, in the very nature of things, works no change in
the principle underlying the rule of law in respect thereto.
Our conclusions are that, notwithstanding the rapidity
of the changes in the course of the channel, and the wash-
ing from the one side and on to the other, the law of accre-
tion controls on the Missouri River, as elsewhere; and
that not only in respect to the rights of individual land-
owners, but also in respect to the boundary lines between
States. The boundary, therefore, between Iowa and
Nebraska is a varying line, so far as affected by these
changes of diminution and accretion in the mere washing
of the waters of the stream." And, in the same case, the
decision clearly points the distinction between the losses
and gains thus described, and an abrupt, visible change
where at one place, at a particular time, the river having
"pursued a course in the nature of an ox-bow, suddenly

cut through the neck of the bow and made for itself a new channel" (p. 370).

The present case falls within the category first mentioned, and according to general principles of law the owner would bear the losses caused by the washings of the river.

The bill also alleges that "some years ago the United States Government, in the interest of navigation and in order to increase the depth of water in the harbor of Pittsburgh, caused a dam to be constructed across the Ohio River a short distance below said Brunot's Island known as the Davis Island Dam. The effect of this dam was to very decidedly increase the depth of the water in the channel back of Brunot's Island, and to cause the water of the river to flow higher upon the land of your orator, and to submerge same to a far greater extent and in fact to make said water which submerged your orator's land navigable at certain times, and for certain purposes, which was not navigable before the construction of said dam."

It will be observed that it is said that the United States caused the erection of the dam in the interest of navigation. The complainant purchased the island subsequently, in the year 1896. And we are not concerned here with the question whether there was any appropriation of land of the former owner by the United States and a cause of action arose to recover its value. *Gibson* v. *United States,* 166 U. S. 269; *United States* v. *Lynah,* 188 U. S. 445; *Bedford* v. *United States,* 192 U. S. 217; *Manigault* v. *Springs,* 199 U. S. 473; *C., B. & Q. Ry.* v. *Drainage Commissioners,* 200 U. S. 561, 583, 584. So far as the bill shows the dam was lawfully built, and the allegations with respect to it wholly fail to state any case entitling the complainant to relief by reason of its construction.

(2) The complainant, however, insists that the effect of the Pennsylvania statute was to fix the boundary of the island permanently at the State Commissioners' high-

water line, and hence that within that line it was entitled to make the desired reclamation and improvement.

This statute (act of sixteenth April, 1858), provided that the Commissioners' lines approved by the court should "forever after be deemed, adjudged and taken firm and stable for the purposes aforesaid." The Supreme Court of Pennsylvania has held that the purpose of the act was to regulate the rights of the public in respect to navigation and to prevent private rights from being exercised to the prejudice of the public interest. *Wainwright* v. *McCullough*, 63 Pa. St. 66; *Zug* v. *Commonwealth*, 70 Pa. St. 138, 142; *Poor* v. *McClure*, 77 Pa. St. 214, 219; *Allegheny City* v. *Moorehead*, 80 Pa. St. 118, 139, 140. In *Wainwright* v. *McCullough* (1869), *supra*, that court, holding that the statute was not applicable to disputed boundaries between private owners, considered the navigable character of the rivers to which it related, the extent of riparian rights under the law of the State, and the meaning of the act in the light of the mischief which it was intended to correct. The court said (p. 73):

"In order to arrive at the legal effect of the lines established by the commissioners under that act, we must ascertain its true purpose; and to reach this, it becomes necessary to examine the navigable character of the rivers Allegheny, Monongahela and Ohio, and the rights of the riparian proprietors upon their banks. These rivers are among the largest in the state; larger than the Schuylkill and Lehigh, recognized as navigable in the early history of the province, and have been repeatedly held by name to be rivers naturally navigable, and therefore classed with the Delaware and Susquehanna: *Carson* v. *Blazer*, 2 Binney, 478; *Shrunk* v. *Schuylkill Nav. Co.*, 14 S. & R. 79, 80; *Hunter* v. *Howard*, 10 S. & R. 244. Many acts have been passed declaring tributaries of these rivers navigable. But an act perhaps most pertinent to this controversy is that of 8th April, 1785, 2 Sm. Laws, 317,

regulating the taking up of lands within the new purchase, of which the 13th section expressly excepts *islands* in the Ohio, *Allegheny* and Delaware.

       *       *       *       *       *       *       *       *

"This being the navigable character of the stream, the rights of the riparian owners are settled by numerous decisions, a few of which may be referred to: *Carson* v. *Blazer, supra; Shrunk* v. *Schuylkill Nav. Co., supra; Ball* v. *Slack,* 2 Whart. 508; *Zimmerman* v. *Union Canal Co.,* 1 W. & S. 346; *Bailey* v. *Miltenberger,* 7 Casey, 37; *Mc-Keen* v. *Delaware Div. Canal Co.,* 13 Wright, 424; *Tinicum Fishing Co.* v. *Carter,* 11 P. F. Smith, 21, opinion by Sharswood, J., decided last winter at Philadelphia. From these and other cases, it will appear that the absolute title of the riparian proprietor extends to high-water mark only, and that between ordinary high and ordinary low water-mark, his title to the soil is qualified, it being subject to the public rights of navigation over it, and of improvement of the stream as a highway. He cannot occupy to the prejudice of navigation or cause obstructions to be placed upon the shore between these lines, without express authority of the state.

"The case of *Bailey* v. *Miltenberger,* 7 Casey, 37, decided in 1856, doubtless had something to do in turning public attention to the shores of the streams surrounding the city of Pittsburg, which led to the passage of the Act of 1858, for the purpose of defining the low and high water-lines. It referred to the mistaken idea entertained by some proprietors of making ground for their mills, by depositing cinders on the shore between low and high water marks. 'The Allegheny and many other navigable rivers' (says the opinion) 'do not, at the time of low water, occupy over one-third of their bed; and it would be most disastrous to allow every owner to fill out his land to low water-mark.' This state of affairs, for these rivers had been seriously encroached upon at and opposite Pittsburg,

no doubt led to the Act of 16th April, 1858, Pamph. L. 326. It begins by a recital, 'Whereas, The lines of lands on and along the shores at the rivers at and near the city of Pittsburg, in the county of Allegheny, have never yet been clearly ascertained, and as it is important to the owners of such lands, the persons navigating the waters of, and the corporations adjacent to, such rivers, and to all parties interested, to know and to have their several rights and privileges in extension and limitation ascertained and defined; therefore,' &c. The first impression arising from this language might seem to be that the law was intended to ascertain and fix these high and low water lines to end all controversies, *private* as well as public. But a careful consideration of its purpose and provisions shows that it is not applicable to disputed boundaries between private owners, but was intended to regulate the respective rights of the public and the landowners, over whose property the right of navigation extends between high and low water lines.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"The effect of the lines as established is thus stated: 'the lines so approved shall for ever after be deemed, adjudged and taken, firm and stable for the purposes aforesaid.' If we seek for the 'aforesaid' purposes, the act discloses none but those relating to the public interest and that of the riparian owner. Then if we advert to the power of the state over navigable streams, as stated in the authorities cited, we discover that it is plenary over the subject of navigation and the improvement of these natural channels of commerce, while the ownership of the riparian proprietor is qualified between the lines of low and high water. The legislature may, therefore, with great propriety define the bounds of high and low water, by means of a suitable commission, for the purpose of regulating the public right, so as not to conflict with private interests, and to prevent private rights from being exercised

to the prejudice of public interests; for example, to prevent the shores from being filled up with great banks of cinders."

In *Allegheny City* v. *Moorehead* (1875), *supra*, the question was presented whether by the fixing of water lines under the act of 1858, title had been vested in the city of Allegheny or lot owners, so as to defeat the claim of the plaintiff Moorehead under a subsequent patent from the State. The court said (p. 139): "Nor can the operation of the Act of 1858 be extended by the act of the commissioners in running out the low-water line of the northern shore of the river to include a part of what was Killbuck island. It was not the purpose of the commissioners to transfer titles, but to mark the boundaries of *riparian* rights, so as to make them certain and permanent in their extent. So it was not the intention of the framers of the Act of 1858 to pass titles to lands, or to ascertain boundaries between individuals; but it was their purpose to regulate the right of navigation along the shores of these rivers by establishing high- and low-water lines, which would definitely ascertain and fix the extent to which the right could be exercised; and the extent to which the owners of the land could exercise their own rights under the law of the state."

It is contended for the complainant that the effect of the statute was to secure to riparian owners complete protection against any loss of their land, or of the right to build upon it, by reason of the gradual washing away of the banks of the river; that the State chose to resign to the riparian proprietors its right to such additions from the moving landward of the low-water mark, and required the owner at the same time to surrender in the interest of navigation his right to alluvion. In support, the complainant cites the opinion of the Court of Common Pleas No. 2 of Allegheny County in *Briggs* v. *Pheil* (1894), 42 Pittsburgh Legal Journal, p. 18, in which it is said with respect to the same statute: "At the passage of this act

the riparian owner owned absolutely to high water mark, and had a qualified property to low water mark, and outside of the low water mark the title to the soil was in the State. It seems to us there can be no doubt that the State had power to enact that thereafter the legal limits of the property should remain unchanged, either by gradual accretions or by gradual cutting away. This in our opinion was intended to be done and was done by the Act of Assembly and the proceedings thereunder. . . . It seems to us that the establishing of these lines, at least, as between the State and riparian owners, fixed the lines for the future. If the river washes in beyond the high water line the owner may fill up and reclaim the lost land, and on the other hand accretions belong to the State or the municipalities."

The established doctrine is invoked that the title to the soil under navigable waters within their territorial limits, and the extent of riparian rights, are governed by the laws of the several States, subject to the authority of Congress under the Constitution of the United States. *Martin* v. *Waddell*, 16 Pet. 367; *Pollard* v. *Hagan*, 3 How. 212; *Weber* v. *Harbor Commissioners*, 18 Wall. 57; *Barney* v. *Keokuk*, 94 U. S. 324, 338; *Packer* v. *Bird*, 137 U. S. 661, 669; *St. Louis* v. *Rutz*, 138 U. S. 226, 242; *Hardin* v. *Jordan*, 140 U. S. 371, 382, 402; *Illinois Central R. R. Co.* v. *Illinois*, 146 U. S. 387, 435, 452; *Shively* v. *Bowlby*, 152 U. S. 1, 40–47; *Water Power Co.* v. *Water Commissioners*, 168 U. S. 349, 365. Let it be assumed that the Pennsylvania statute in its regulation of rights, established the Commissioners' high-water line as the permanent boundary of the island and conferred upon the riparian owner, so far as it was within the competency of the State to confer it, the right to fill in and to erect structures to the limit of this line, regardless of subsequent changes in the actual high-water line caused by the washing away of the banks of the river. What, then, was the power of Congress with

respect to the river and what was the extent of the authority conferred upon the Secretary of War?

When the Secretary of War, in 1895, fixed harbor lines he dealt with the stream as it then existed. Whatever right the owner of the island may have had under the state law to reclaim the submerged land within the former line of high water, had not been exercised. The bill, in alleging that the new harbor line ran across the complainant's land, must be taken to refer to the submerged land already described. This is the import of its allegations and is shown by the record of the War Department annexed to the bill. In establishing this line, the Secretary of War followed quite closely the actual line of high water as it existed in 1895, except in the back channel of Brunot's Island where it ran several hundred feet outside the then high-water mark. The change of the harbor line at this point, in 1907, was for the purpose of making the line coincide with the actual high-water mark and in the report of the United States engineer who advised the change it was said that the lines as previously established had "not been filled out to, and the river bed on the Brunot Island side, and in the bend referred to" was in "essentially the same condition" as at the time the harbor lines of 1895 were fixed. He added:

"Pittsburgh suffers annually from floods and in my opinion any material contraction of the channel immediately below the city would result in general injury and would produce conditions detrimental to navigation and to harborage, and it is respectfully recommended that the changes in the established harbor lines shown and described on the map inclosed herewith be made, such changes being necessary in preserving and protecting the harbor of Pittsburgh.

"The location of the proposed harbor lines recommended in this communication is within the bed of the stream as it exists as a physical fact."

To this stream, as a highway of commerce, the power of Congress extended; a power which "acknowledges no limitations other than are prescribed in the Constitution." *Gibbons* v. *Ogden*, 9 Wheat. 1, 196. The exercise of this power could not be fettered by any grant made by the State of the soil which formed the bed of the river, or by any authority conferred by the State for the creation of obstructions to its navigation. "Commerce includes navigation. The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States which are accessible from a State other than those in which they lie. For this purpose they are the public property of the nation, and subject to all requisite legislation by Congress. This necessarily includes the power to keep them open and free from obstructions to their navigation, interposed by the States or otherwise; to remove such obstructions when they exist; and to provide, by such sanctions as they may deem proper, against the occurrence of evil and for the punishment of offenders. For these purposes, Congress possesses all the powers which existed in the States before the adoption of the national Constitution, and which have always existed in the Parliament in England." *Gilman* v. *Philadelphia*, 3 Wall. 713, 725.

Nor is the authority of Congress limited to so much of the water of the river as flows over the bed of forty years ago. The alterations produced in the course of years by the action of the water do not restrict the exercise of Federal control in the regulation of commerce. Its bed may vary and its banks may change, but the Federal power remains paramount over the stream, and this control may not be defeated by the action of the State in restricting the public right of navigation within the river's ancient lines. The public right of navigation follows the stream (Rolle's Abr. 390; *Carlisle* v. *Graham*, L. R. 4 Ex.

361, 367, 368) and the authority of Congress goes with it. When the State of Pennsylvania established harbor lines and thus undertook to regulate the rights of navigation, its action, however effective as between the State and the riparian proprietors, was necessarily subject to the paramount power of Congress. The state lines can be conceded no permanent force, as against the will of Congress, without substituting for its constitutional authority the supremacy of the State with respect to navigable waters.

It is for Congress to decide what shall or shall not be deemed in judgment of law an obstruction of navigation. *Pennsylvania* v. *Wheeling and Belmont Bridge Co.*, 18 How. 421. And in its regulation of commerce it may establish harbor lines or limits beyond which deposits shall not be made or structures built in the navigable waters. The principles applicable to this case have been repeatedly stated in recent decisions of this court. *Gibson* v. *United States*, 166 U. S. 269; *Scranton* v. *Wheeler*, 179 U. S. 141; *C., B. & Q. Ry. Co.* v. *Drainage Commissioners*, 200 U. S. 561; *West Chicago R. R.* v. *Chicago*, 201 U. S. 506; *Union Bridge Co.* v. *United States*, 204 U. S. 364; *Monongahela Bridge* v. *United States*, 216 U. S. 177; *Hannibal Bridge Co.* v. *United States*, 221 U. S. 194.

In *Gibson* v. *United States, supra,* the construction of a dyke in the Ohio River under the authority of the Secretary of War had substantially destroyed the landing on and in front of a farm owned by Mrs. Gibson "by preventing the free egress and ingress to and from said landing" to "the main or navigable channel" of the river. The court said (pp. 271, 272, 275): "All navigable waters are under the control of the United States for the purpose of regulating and improving navigation, and although the title to the shore and submerged soil is in the various States and individual owners under them, it is always subject to the servitude in respect of navigation created in favor of the Federal government by the Constitution.

*South Carolina* v. *Georgia,* 93 U. S. 4; *Shively* v. *Bowlby,*
152 U. S. 1; *Eldridge* v. *Trezevant,* 160 U. S. 452. . . .
The Fifth Amendment to the Constitution of the United
States provides that private property shall not 'be taken
for public use without just compensation.' Here, however,
the damage of which Mrs. Gibson complained was not the
result of the taking of any part of her property, whether
upland or submerged, or a direct invasion thereof, but
the incidental consequence of the lawful and proper ex-
ercise of a governmental power."

Again, in *Scranton* v. *Wheeler, supra,* the question arose
with respect to the riparian owner whose access from his
land to navigability was permanently lost by reason of
the construction by the United States of a pier resting on
submerged lands in front of his upland. The court said in
its opinion (p. 163): "The primary use of the waters and
the lands under them is for purposes of navigation, and
the erection of piers in them to improve navigation for the
public is entirely consistent with such use, and infringes
no right of the riparian owner. Whatever the nature of
the interest of a riparian owner in the submerged lands in
front of his upland bordering on a public navigable water,
his title is not as full and complete as his title to fast land
which has no direct connection with the navigation of
such water. It is a qualified title, a bare technical title,
not at his absolute disposal, as is his upland, but to be
held at all times subordinate to such use of the sub-
merged lands and of the waters flowing over them as may
be consistent with or demanded by the public right of
navigation."

In *Union Bridge Co.* v. *United States, supra,* the Secre-
tary of War found a bridge to be an unreasonable obstruc-
tion to the free navigation of the Allegheny River and re-
quired the Bridge Company to make certain changes
which it was insisted it could not be compelled to make
without compensation. The court, after reviewing the

authorities, said (pp. 400, 401): "Although the bridge, when erected under the authority of a Pennsylvania charter, may have been a lawful structure, and although it may not have been an unreasonable obstruction to commerce and navigation *as then carried on,* it must be taken, under the cases cited, and upon principle, not only that the company when exerting the power conferred upon it by the State; did so with knowledge of the paramount authority of Congress to regulate commerce among the States, but that it erected the bridge subject to the possibility that Congress might; at some future time, when the public interest demanded, exert its power by appropriate legislation to protect navigation against unreasonable obstructions. Even if the bridge, in its original form, was an unreasonable obstruction to navigation, the mere failure of the United States, at the time, to intervene by its officers or by legislation and prevent its erection, could not create an obligation on the part of the Government to make compensation to the company if, at a subsequent time, and for public reasons, Congress should forbid the maintenance of bridges that had become unreasonable obstructions to navigation. It is for Congress to determine when it will exert its power to regulate interstate commerce. Its mere silence or inaction when individuals or corporations, under the authority of a State, place unreasonable obstructions in the waterways of the United States, cannot have the effect to cast upon the Government an obligation not to exert its constitutional power to regulate interstate commerce except subject to the condition that compensation be made or secured to the individuals or corporation who may be incidentally affected by the exercise of such power. The principle for which the Bridge Company contends would seriously impair the exercise of the beneficent power of the Government to secure the free and unobstructed navigation of the waterways of the United States. We cannot give our

assent to that principle. In conformity with the adjudged cases, and in order that the constitutional power of Congress may have full operation, we must adjudge that Congress has power to protect navigation on all waterways of the United States against unreasonable obstructions, even those created under the sanction of a State, and that an order to so alter a bridge over a waterway of the United States that it will cease to be an unreasonable obstruction to navigation will not amount to a taking of private property for public use for which compensation need be made."

It must be concluded, therefore, that it was competent for Congress to provide for the establishment of the harbor lines in question for the protection of the harbor of Pittsburgh. It acted within its constitutional power in authorizing the Secretary of War to fix the lines. *Union Bridge Co.* v. *United States, supra* (pp. 385–388); *Monongahela Bridge* v. *United States, supra* (p. 192). That officer did not exhaust his authority in laying the lines first established in 1895, but was entitled to change them, as he did change them in 1907, in order more fully to preserve the river from obstruction. And, in none of the acts complained of, did he exceed the power which had been conferred.

The bill failed to show any ground upon which the complainant was entitled to relief and it was properly dismissed.

*Decree affirmed.*