## UNITED STATES v. MERCHANTS TRANSFER & STORAGE CO. et al.

## MERCHANTS TRANSFER & STORAGE CO. et al. v. UNITED STATES et al.

### No. 10573.

Circuit Court of Appeals, Ninth Circuit.

July 31, 1944.

Dissenting Opinion Aug. 14, 1944.

ated in the Port of Embarkation, an area largely taken over by the government after the nation's entry into the war. On July 29, 1943, acting Secretary of War Patterson requested the Attorney General to institute proceedings to condemn this warehouse, and to procure from the court an order for immediate possession pursuant to the Act of March 27, 1942, the Second War Powers Act, 50 U.S.C.A.Appendix, § 631 et seq. In his official letter the Secretary stated that the warehouse was "to be used for the storage of military supplies and for other military purposes and the utmost haste in expediting this project is vital to the successful prosecution of the war." The estate requested to be condemned was one for a term of years ending June 30, 1944, extendible for yearly periods thereafter during the existing national emergency at the government's option.[1]

Four days later the United States, through a special assistant to the Attorney General, instituted suit in the court below to condemn the property. The petition recited the various acts of Congress under authority of which it was filed, and stated the substance of the Secretary's opinion as to the necessity for the taking and the nature of the estate sought to be condemned. It prayed that condemnation be adjudged, that immediate possession be authorized by the court, and that compensation be determined.

Merchants moved to dismiss the petition on the ground, among others, that the pleading failed to show public necessity for the taking. Hearings on the request for an order granting immediate possession followed. Witnesses for the government testified that the warehouse was to be used for the storage of materials intended for the repairing, outfitting and supplying of ships of the Army Transport Command; that the volume of military traffic through the port was increasing steadily and that the use of the building would be absolutely required within thirty days; that the warehouse was entirely surrounded by property of the United States, hence immediate possession was essential not only to the war effort but to the establishment of uniform police and fire protection for all the buildings in the Port of Embarkation; and that the necessary elasticity of the port of entry work required the pier sheds to be kept clear of all such heavy material as would

Norman M. Littell, Asst. Atty. Gen., Vernon L. Wilkinson, Lawrence Vold, and Roger P. Marquis, Attys., Dept. of Justice, all of Washington, D.C., and F. P. Keenan, Sp. Asst. to Atty. Gen., for the United States.

Rummens & Griffin, of Seattle, Wash., for Merchants Transfer & Storage Co.

Lewis L. Stedman, of Seattle, Wash., for Skinner & Eddy Corporation, and Lewis L. Stedman, liquidating trustee, etc.

Before STEPHENS and HEALY, Circuit Judges, and FEE, District Judge.

HEALY, Circuit Judge.

Skinner & Eddy Corporation is the owner and Merchants Transfer & Storage Company the lessee of a warehouse on the Seattle waterfront. The property is situ-

[1] The letter indicates that appraisal reports and title evidence were then in process of being obtained, but the probable date of availability thereof was not given.

be stored in the warehouse. On the other side witnesses testified to the saturation of general warehouse facilities in Seattle, and in the event this property were taken, to the impracticability of maintaining service by large merchandising companies which used Merchants as a distribution point from which retail outlets were supplied.

On August 13 the court announced its view that it was not presently necessary that the government acquire the warehouse for the purposes stated. Counsel thereupon asked leave to introduce further evidence on the point, but the request was denied. The opinion of the court is officially reported in 51 F.Supp. 905 under the caption United States v. 43,355 Square Feet of Land. We do not stop to analyze it. In essence, while protesting the contrary, the court substituted its judgment on the question of public necessity for that of the Secretary, compare United States v. Montana, 9 Cir., 134 F.2d 194; United States v. 243.22 Acres of Land, 2 Cir., 129 F.2d 678, 683, and this, as is now known, at a moment when operations in the Pacific were approaching a critical stage. The prayer for an order granting immediate possession was denied. The court declined, however, to rule upon defendants' motion to dismiss.

On September 8, 1943 the War Department through the instrumentality of the Army, seized the premises and posted guards.[2] Thereupon the owner and lessee filed what was termed "petition for rule and attachment in re contempt," wherein the seizure was set out and a violation of the court's order alleged. The petition prayed that attachment issue for contempt against two local officers (Sherman Green and Major Tidemon) and against Undersecretary Patterson and Secretary Stimson; and that the possession of the premises be forthwith restored to the petitioners. The court issued an order to show cause why the named persons should not be held in contempt and why the relief asked should not be granted.[3] The United States interposed a plea to the jurisdiction of the

court; and a motion to quash the order was filed by the individuals cited. Secretary Stimson and Undersecretary Patterson appeared specially for the purpose of the motion, asserting absence of jurisdiction of their persons because of the want of valid service of process.

There followed a hearing at the conclusion of which it was found that the four natural persons had done nothing forbidden by the court and were not in contempt. However, the court found "that the plaintiff, United States of America, has taken possession of the property in issue unlawfully and without right and contrary to this Court's order of August 13, 1943, denying it immediate possession." It was adjudged that the United States "forthwith return said property" to the possession of the petitioners, and that "if upon the entry of this order possession is not forthwith restored to said parties named, then the United States of America will be later assessed as for contempt damages the amount thereof to be ascertained by further hearings herein, at which hearings consideration may be given to such damages as those entitled to possession will suffer from day to day during the time that the United States of America wrongfully withholds that possession."

The government's appeal is from this order. There is a cross-appeal by the petitioners from the portion of it absolving the individuals of contempt.

In the briefs much is said of the general power of appropriation vested in the Secretary of War, cf. United States v. North American Transportation & Trading Co., 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed. 935. Extensive argument is devoted to the question whether, under that part of the Second War Powers Act providing for the immediate taking of possession, the government was legally empowered to seize the property after having instituted its action to condemn, funds being then available for the payment of compensation for the property.[4]

[2] At the hearing below counsel for the government stated (and the statement was not controverted) that Merchants was not required immediately to vacate. It was not allowed to bring in any more merchandise, but was permitted to liquidate goods in storage as of the time of the seizure.

[3] The order was served on the officials by mail and telegram.

[4] Title II of the Second War Powers Act, 50 U.S.C.A.Appendix, § 632, which amended the corresponding statute enacted during the First World War (Act of July 2, 1917, 50 U.S.C.A. § 171), so far as pertinent, reads as follows: "The Secretary of War * * * or any other officer * * * authorized by the President * * * may cause proceedings to be in-

■ We do not reach these questions since we are of opinion that the court was without jurisdiction to order the United States to vacate or to adjudge the United States liable in damages in the event of its failure to obey the injunction. The court had made no order prohibiting the United States from taking possession of the warehouse, nor did it possess power to make such an order. Cf. Hurley, Secretary of War, v. Kincaid, 285 U.S. 95, 52 S.Ct. 267, 76 L.Ed. 637. It had merely declined, in the exercise of its discretion, to grant the government's request for an order of immediate possession. The question of the sovereign's authority to occupy the property in the absence of judicial permission was no part of the subject matter of the suit pending before the court.

■ The United States may not be sued except with its consent. "The objection to a suit against the United States is fundamental, whether it be in the form of an original action, or a set-off, or a counterclaim. Jurisdiction in either case does not exist unless there is specific congressional authority for it." Nassau Smelting & Refining Works v. United States, 266 U.S. 101, 106, 45 S.Ct. 25, 69 L.Ed. 190. For other holdings announcing this elementary principle see Illinois Central R. Co. v. Public Utilities Commission, 245 U.S. 493, 504, 38 S.Ct. 170, 62 L.Ed. 425; United States v. Shaw, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888; United States v. United States Fidelity Co., 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894. As stated in the latter case, 309 U.S. at page 514, 60 S.Ct. at page 657, 84 L.Ed. 894, "consent alone gives jurisdiction to adjudge against a sovereign. Absent that consent, the attempted exercise of judicial power is void."

■ No act of Congress has been cited authorizing the rendition against the United States of such a judgment as was entered here. The condemnation statutes imply no authority for it. Moody v. Wickard, 78 U.S.App.D.C. 80, 136 F.2d 801. Cf. New York Telephone Co. v. United States, 2 Cir., 136 F.2d 87. Appellees rely on the statement in The Thekla, 266 U.S. 328, 45 S.Ct. 112, 113, 69 L.Ed. 313, to the effect that "when the United States comes into Court to assert a claim it so far takes the position of a private suitor as to agree by implication that justice may be done with regard to the subject matter." Appeal to the doctrine of The Thekla is fruitless. The authority of that holding has been limited to the necessities of proceedings in admiralty, where the court is obliged to determine the cross-libel as well as the original libel to reach its conclusion. Shaw v. United States, supra, 309 U.S. at pages 502-504, 60 S.Ct. at pages 662, 663, 84 L.Ed. 888.

■ We think there is no merit in the cross-appeal. The court found that the individuals before it had done nothing forbidden by its order and had not failed to do anything commanded. The parties, including the cross-appellants, have proceeded throughout, both below and here, on the assumption that the seizure effected September 8 was made under authority and at the direction of the Secretary of War. There is ample showing to support the assumption, and there is no warrant in the record for any other. The findings and judgment of the trial court proceed expressly on that basis.[5]

Presumably because of the controversy giving rise to the appeal, the condemnation suit has not been proceeded with in the

---

stituted in any court having jurisdiction of such proceedings, to acquire by condemnation, any real property, temporary use thereof, or other interest therein * * * that shall be deemed necessary, for military * * * purposes, such proceedings to be in accordance with the Act of August 1, 1888 (25 Stat. 357) [Title 40, §§ 257, 258], or any other applicable Federal statute. * * * Upon or after the filing of the condemnation petition, immediate possession may be taken and the property may be occupied, used, and improved for the purposes of this Act [this section and section 171 of Title 50], notwithstanding any other law."

5 No formal testimony appears to have been taken in the contempt proceeding.

. The reason is obvious. Aside from averments of illegality, the factual allegations of the sworn petition in re contempt together with the attached exhibits were accepted as true by the court and by the parties, including Secretary Stimson who, as has been said, appeared specially through counsel in response to the show cause order. The petition expressly alleged that the United States, acting through the War Department, had seized the property; that Secretary Stimson, with full notice of the court's order of August 13, had by himself and through named subordinates unlawfully violated that order by forcibly taking possession of the premises. The entire petition proceeds on the express basis of an unlawful seizure by order and di-

normal manner. Declaration of taking should now be filed or just compensation for the taking be determined speedily under the general statutes governing suits to condemn.

The decree ordering the United States to return the property and holding the United States liable in damages as for contempt is reversed.

JAMES ALGER FEE, District Judge (dissenting).

We are all agreed upon the propositions which follow: First, the authority of the executive to take private property by virtue of the war power is not here involved since the Government claims to act under a specific provision of the Second War Powers Act, 50 U.S.C.A.Appendix, § 631 et seq.; second, the determination of the necessity of taking an interest in this particular property made by the Secretary of War under the judicial process proceeding as prescribed by Act of Congress, was a finality, and could not be properly questioned or opposed by the trial court; third, the order of the trial court insofar as it was based upon a denial of the right of the Secretary to determine whether it was necessary and advantageous to take this particular property (see 51 F.Supp. 905) was erroneous and constituted an abuse of discretion and, if appealed from, must have been reversed; fourth, the cross appeal should be dismissed; fifth, the order of the court directing the return of the property by the United States, holding the United States in contempt, and laying the basis for assessment of "contempt damages" against the United States is erroneous and must be reversed.

The propositions so outlined are sufficient to dispose of this case. It is apparent that the majority do not intend to hold more. We should not, then, deal wtih the future proceedings in the condemnation case at all. In all events, such directions, if given, should be in accordance with law and unmistakeable in effect. The expressions and directions of the majority opinion, although they do not hold the point, indicate that even if the United States be found in possession of this real property, that the trial court has no power to compel the United States to pay the "just compensation" in the condemnation proceeding in accordance with the Fifth Amendment, but that Merchants may be compelled to seek an inadequate redress in the Court of Claims. Such a position is subversive of the rights of a citizen whose property is being taken without his consent by the Government, and is contrary to the consistent intention of congressional legislation upon the subject. From any such implications, I dissent.

The direction given by the majority as to the further proceedings in this condemnation suit, leaves room for doubt. This direction is as follows:

"Declaration of taking should now be filed or just compensation for the taking be determined speedily under the general statutes governing suits to condemn."[1]

The record which is before us shows that the attorneys for the Government have expressly refused to file a declaration of taking in this case. The trial court offered to permit the Government to thus ratify the acts of its agents who had taken possession of this property, and thus bind itself to an acceptance of the award. Great surprise was expressed that taking of possession was coupled in the mind of the trial court with provision for payment of the just compensation to be set in the proceeding.

The attorneys for the Government, in the alternative, suggested at that hearing that the trial court proceed to fix the just compensation just as the majority opinion now directs. But the record shows no indication, or suggestion, that the Government would, by deposit or consent to be bound by the terms of the judgment, agree to pay the amount so fixed. Indeed it was there stated that:

"The full faith and credit of the United States Government is pledged to pay the

rection of the Secretary. The notice served on the occupants, a copy of which was attached to the petition, states that the United States is taking immediate possession, and that the Secretary of War has delegated authority to do so to the officer signing the notice.

When the court announced its purpose to hold the United States in contempt, the assistant attorney general, referring to the seizure of September 8, said: "The fact of the matter is that the war power is being exercised by direction of the Secretary of War, that these officers [referring to the local officers of the Army] are obeying the command of the Secretary of War." No contrary contention was at any time expressed during the course of the hearing.

[1] Page 328, Majority Opinion.

property owner for the property * * *. He is not without his remedy. He gets reimbursement in full for what has been taken from him."

This is a distinct suggestion that the United States does not have to pay the just compensation assessed in this case, but may dismiss this action even though its agents have possession of this real property, and relegate Merchants to an action in the Court of Claims.

It is, of course, of extreme importance in time of war, that the operations of the United States be not hampered or impeded. In respect to this property, however, at the present moment, every possible right or interest of the Government is amply safeguarded. The military has held possession of this property for almost a year, and has used it to serve the purposes of the United States.

The vital issue then, is whether the Merchants can obtain the "just compensation" assessed in this condemnation proceeding under the guarantees of the Fifth Amendment. Orthodox doctrine indicates that wherever the United States has actually taken possession of real property, by whatever means, which is subject of a condemnation action, it should pay the amount fixed therein by the triers of fact, as "just compensation."

However, in certain federal cases, it is indicated that the court has no power to enter a money judgment in such an action against the United States, even where the Government is in possession of the land. In Moody v. Wickard, 78 U.S.App.D.C. 80, 136 F.2d 801, 804, the Secretary of Agriculture had filed an action in condemnation under the Act of August 1, 1888, 40 U.S.C.A. §§ 257, 258. The United States already had possession of the lands under a contract. The just compensation for the lands was assessed in a federal court. The trial court entered a judgment against the United States for the amount of the just compensation according to the finding of the triers of the facts. The United States refused to pay the judgment. The Circuit Court of Appeals of the District of Columbia refused to compel payment. There the court say:

"Enough has been said, we think, to show that the United States were free to abandon the condemnation proceeding at any time before payment of the award and transfer of title, that they took no title until payment, that the possession of the land by the United States did not make these rules inapplicable, and therefore that the District Court in North Carolina had no authority to enter a personal judgment against the United States."

The suggestion in the Moody case that an action in the Court of Claims [2] provides an appropriate substitute for direct award in the condemnation proceedings, is not true. In the Court of Claims, although payment for the use may eventually have been made, the remedy is not that contemplated by the "due process" and "just compensation" clauses of the Fifth Amendment. It would involve bringing an action by Merchants upon implied contract where there would be evaluated, not the interest which the United States has described in the petition for condemnation and seeks presently to take, but only payment for use from the time of taking to the time when the officials see fit to abandon the property. These are entirely different rights and remedies and one is not a substitute for the other, since the incidents of each are entirely different.

This is made plain by United States v. North American Transportation & Trading Co., 253 U.S. 330, 337, 40 S.Ct. 518, 521, 64 L.Ed. 935:

"For * * * such a proceeding [condemnation proceedings brought by the Government] is not a suit by the landowner to collect a claim against the United States, but an adversary proceeding in which the owner is the defendant and which the government institutes in order to secure title to land. * * * On the other hand, this suit brought in the Court of Claims is a very different proceeding."

Again in the same case it is said:

"The right to bring this suit against the United States in the Court of Claims is not founded upon the Fifth Amendment * * * but upon the existence of an implied contract entered into by the United States."

Without conceding the correctness of the Moody case, which simply and without cause gave the United States two trials

---

[2] The Moody case refers to suits under the Tucker Act, 28 U.S.C.A. § 41(20), which is probably not applicable here on account of the monetary limitations of jurisdiction. The principle is the same since suits under the Tucker Act are without jury and are permissive. Also see United States v. McCrory, 5 Cir., 119 F. 861.

of an issue of fact, it should be held here, if we are to speak on the subject, that the trial court has the power, since possession has been taken in the interest of the United States of property under the jurisdiction of the court, to require as a condition of either prosecution or abandonment of the proceeding, that the United States post security for the payment of the award.

In the instant case, the questions of whether the United States is in possession of these lands "unlawfully and without right" as the trial court held, or whether certain individuals are in possession on the business of the government, but tortiously and without right, are seriously debated. In any event, the trial court which has jurisdiction of the property and the proceeding, in the interests of justice, has the power to require security for the payment of the award in this case, by the United States, in order that the untoward result of the Moody case may be avoided. The filing of a declaration of taking and the concomitant deposit of estimated just compensation under the appropriate statute, would confirm the possession of the United States, ratify the acts of its agents who are using the property on the business of the Government, and remove all question of the legality of taking. Most important of all, the filing of the declaration of taking would irrevocably commit the United States to pay the ultimate award in these proceedings and prevent the dismissal and abandonment thereof by the United States. A distinguished lawyer, William D. Mitchell, then Attorney General of the United States, in recommending the Declaration of Taking Act for passage by Congress said:

"In many cases we know that the ultimate award will not exceed the existing appropriation, but nevertheless cannot legally commit the government irrevocably to the payment of the award and of course, unless the government is ready to bind itself to pay the ultimate award, it should not be allowed to take possession before the final judgment."[2a]

No time need be wasted upon the question of whether the United States consented to the consideration by the trial court of a cause of action against it involving a mandatory injunction, or a judg-

ment for "contempt damages." Based upon historical acceptance of the doctrine, it is established that the United States can not be held liable for tort. No statute has abrogated that principle of our law. To hold the sovereign liable for contempt of itself in its own court is outside the pale of common-law concepts. No present situation requires readjustment in this field. This order appealed from was beyond the power of the court, but the question of consent was not involved.

The United States did submit itself to the jurisdiction of the court for the purpose of the award of just compensation by preliminary judgment. If the United States had, after the entry of preliminary judgment, deposited the amount of the award, the court would have had jurisdiction to transfer the interest described in the land, and require the surrender of possession of the real property to the United States. If the United States desired to take possession before preliminary award, the court would have power to grant a motion for possession. If the motion were granted, the court could compel the landowner to surrender possession to the United States. If such a motion were made, the United States would consent to the disposal of possession by the court.

The acting Secretary of War[3] who exercised the powers of that office pursuant to statute, was obviously of the opinion that the government could only obtain possession of this property through court order. In the letter which was written to lay the statutory basis for the condemnation proceedings, this language is used:

"It is requested that pursuant to the provisions of the Act of Congress approved March 27, 1942, (Public Law 507 77 Congress) supra, you procure *from the court* an order granting to the United States immediate possession of the aforesaid lands."[4]

This is the only direct expression of the Secretary of War contained in this record. Since the letter containing this expression constituted the statutory condition precedent to the filing of the condemnation proceedings, and the taking of possession of said lands, it was jurisdictional. This direction was obeyed and carried into the

---

[2a] Letter of William D. Mitchell, Attorney General, to Hon. George S. Graham, December 2, 1930.

[3] The Undersecretary of War may sign as acting secretary, but the authority does not extend to others. See 5 U.S.C.A. § 4.

[4] Emphasis supplied.

petition for condemnation which the court was asked to grant. Since by legislative mandate, the Secretary of War is the only authority here involved who could ask for the condemnation of these lands by judicial proceeding, and the only one who could ask for the immediate possession of land under any provision of law, after the filing of the condemnation petition, the United States, by placing this petition on file containing a prayer for possession, and by filing, arguing and submitting to the court a motion to be placed in possession, submitted to the jurisdiction of the court in that respect. The mere fact that the motion was denied, even improperly, did not divest the court of jurisdiction over the proceeding or the property. If appeal had been prosecuted to this court, it would have been disposed of as an emergency by the time of the final hearing of this matter in the trial court.

The foundation was also laid for the filing of a declaration of taking and deposit of estimated compensation, in the letter of the acting Secretary of War, by the statements that money had been appropriated by Congress for the acquisition, and that title evidence and appraisals were in preparation. If the data was not sufficient July 29th, the date of the letter, it might well have been completed August 4th, the date of the first hearing in the trial court, September 8th, the date of seizure, or on September 20th, at the time of the offer of the trial court to withhold the order appealed from, if just compensation was deposited.

It is impossible to explain the failure of the United States when this property was taken by its agents and devoted to its use after the filing of the petition for condemnation, to follow the request of the Secretary of War and to file a declaration of taking binding it to the acceptance of the award, if it is really the intention not to abandon this proceeding, but to pay the judgment for just compensation awarded therein.

In the many thousand condemnation cases filed under the existing legislation, it has been consistent practice to ask the court for possession of the land whether under the Declaration of Taking Act, or without the benefit thereof. Even when no declaration of taking was filed, the trial courts have placed many conditions upon the order, including deposits of money to assure the court that the Government would accept the award in the proceedings. Yet we are assured by the assistant attorney general that this is the only case where a seizure has been made under the alleged authority of the Second War Powers Act. This course is a practical construction of the legislation.

In this case, the Secretary of War was following this normal course of procedure in requesting that possession be obtained by court order. That official had authority to submit the matter of possession to the judgment of the court, either generally or under the Declaration of Taking Act. Once submitted under his jurisdictional request, the jurisdiction over possession could not be withdrawn. The suggestion that "immediate possession" was asked and that jurisdiction of possession subsequently was not submitted to the court, is pure sophistry.

The majority in apparent disregard of the fact that the Secretary of War alone had the power to request, or order possession taken of this property, accepts hearsay evidence of interested parties that the Secretary of War subsequently directed seizure of the property without regard to the fact that he had by his letter of July 29, 1943, given consent of the United States to submission of the right of possession as a judicial question. The majority indicate that it was the assumption of the cross appellants, the Government and the trial court, that the United States was in possession of the lands by order of the Secretary of War. It is true that a civilian, by name Sherman D. Green, apparently an employee of the Army, stated in a notice to Merchants:

"This is to notify you that the United States of America is taking immediate possession of said premises for the term or terms condemned in the aforementioned petition under authority of the Act of Congress approved March 27, 1942, (Public Law 507, 77th Congress), wherein is granted authority to the Secretary of War to take immediate possession of said premises and the Secretary of War having delegated this authority to the Division Engineer through the Chief of Engineers.

"For the Division Engineer
"Sherman B. Green
"Chief, Seattle Sub-Office"

The majority quote the assistant attorney general who indicated that the Secretary of War had ordered the taking. One of the reasons why the majority is correct in affirming the refusal of the trial court to

hold Henry L. Stimson and Robert. P. Patterson in contempt, is that the record does not contain any evidence to support the charge that either of them gave any such order. If that matter were on trial, the majority would neither accept the hearsay, nor the assumptions, as evidence establishing the guilt of either.

Likewise, when Congress has vested a certain official with the authority to appropriate interest in land for the United States, he must act expressly and in strict accordance with the statutory mandate. No assumptions are valid. There is no evidence of any official act of the Secretary of War in relation to this property, or to the possession thereof, except the jurisdictional letter of July 29, 1943, which designates a court order as the method of obtaining possession. The statutes require that the Secretary of War act expressly in order to initiate a condemnation proceeding.[5] The Declaration of Taking Act expressly requires that such a document be signed by the Secretary of War before possession can be surrendered.[5a] It can not be contended that any other person is empowered to seize possession of lands in condemnation by the vague words of another statute.

Neither the Attorney General, nor an army officer, nor a civilian employee of the Army is permitted to act for, or bind the Secretary of War, or the United States, in this regard. In United States v. North American Transportation & Trading Co., 253 U.S. 330, 40 S.Ct. 518, 520, 64 L.Ed. 935, it was said:

"But, although Congress may have conferred upon the Executive Department power to take land for a given purpose, the government will not be deemed to have so appropriated private property, merely because some officer thereafter takes possession of it with a view to effectuating the general purpose of Congress. * * * In order that the government shall be liable it must appear that the officer who has physically taken possession of the property was duly authorized so to do, either directly by Congress, or by the official upon whom Congress conferred the power."

In that case, Congress had authorized and made appropriations for barracks and quarters for troops. One General Randall of the United States Army, commanding the Department of Alaska, took possession as a site for an Army Post, of a tract of land including a mining claim owned by North American Co. There was no direct showing that the Secretary of War had authorized or ordered the taking. The court say:

"But the power granted by those acts was conferred upon the Secretary of War. Act Aug. 1, 1888, c. 728, § 1, 25 Stat. 357 [40 U.S.C.A. § 257]; Act Aug. 18, 1890, c. 797, § 1, 26 Stat. 316 [50 U.S.C.A. § 174]. It was for him to determine whether the army post should be established and what land should be taken therefor."

It was not until the Secretary of War, pursuant to the legislative authority had, some months later, by official act, announced the land as a public reservation, that the property was appropriated and the United States liable therefor. The court say:

"Power to take possession of the company's mining claim was not vested by law in General Randall; and the Secretary of War had not, so far as appears, either authorized it or approved it before December 8, 1900."

In that case it was held that although the acts of General Randall were without authority and hence tortious, that owing to the failure of the company to take immediate action against him, recovery was only allowable in the Court of Claims and there interest upon the value of the property was not allowable.

It is thus established that the Secretary of War, by his letter, gave consent of the United States to the adjudication of the possession of the property during the pendency of the condemnation proceeding, and that he could not withdraw such a submission unless by direct and express action of which there is no evidence in the record. These considerations are decisive of the proposition that the court has the power to condition possession by an order to deposit the estimated compensation.

However, the question of whether there exists, in any event, authority for the

---

[5] Act of August 1, 1888, 25 Stat. 357, 40 U.S.C.A. §§ 257, 258; Act of July 2, 1917, 40 Stat. 241, 50 U.S.C.A. § 171; Act of March 27, 1942, 56 Stat. 176, 50 U.S.C.A. Appendix, § 632.

[5a] "signed by the authority empowered by law to acquire the lands", Act of February 26, 1931, 46 Stat. 1421, 40 U.S.C.A. § 258a.

military or other branch of the Government, to seize possession of real property without court order after a petition has been filed for its condemnation, will now be considered at length.

It is often stated that the power is inherent in the Government to acquire property without resort to condemnation. But this power resides exclusively in the legislative branch. No executive officer, unless expressly designated to exercise such authority by Act of Congress, can lawfully seize or acquire property for the United States.[6] In the language and history of congressional enactments alone can be discovered the repositories of such authority. Such a review will establish the consistent purpose to require acquisition of property by the judicial process and to commit to the courts jurisdiction of the proceedings and property. Congress has not conferred upon the military any right to take possession of land under condemnation except by order of the court wherein jurisdiction is reposed. The court may thus condition an order granting or confirming possession by reasonable requirements, and neither the Government, nor its agents, may lawfully refuse to perform the conditions in order to gain or hold possession.

The sound authorities have held that in order to do exact justice under the Fifth Amendment, the payment of compensation and the taking of possession of the property should be synchronous.[7] In accordance with such authorities, Congress provided in the Act of 1888, that acquisition of property for the United States was to be "by condemnation under judicial process." It was also expressly provided that "the United States district courts of the district wherein such real estate is located, shall have jurisdiction of proceedings for such condemnation." By the same statute, it was provided that the proceedings should conform to those "in like causes" in the state courts. Normally speaking, in such adversary proceedings, the state statutes permitted the assessment of the just compensation, but there was no provision for the payment thereof or for passage of title to, or taking possession of the property, by the Government, until the money was deposited in court, precedent to the entry of final judgment. Many of the state statutes provided that the condemning authority might, upon deposit or security, or pledge of adequate compensation, take immediate possession of the property on the institution of condemnation proceedings. On the other hand, the codes of many states did not contain any such provision.

In 1917, Congress provided for the first time, that the Secretary of War could take advantage of such provisions of the procedure of the various states under the Conformity Act, 28 U.S.C.A. § 724, so that in instances where the state statute so provided, construction could be commenced without waiting for the final acquisition of the title or interest.[8] This enactment will be discussed in detail later.

In 1918, Congress followed this example by providing that the Secretary of War might, in condemnation for river and harbor improvements, "upon the filing of a petition in any such proceedings * * * have the right to take immediate possession of said lands," in the event that just compensation were secured and in such cases "the court shall make such order as shall be just in the premises and as shall adequately protect" the landowner.[9]

In 1929, Congress acting as the local sovereign of the District of Columbia, passed an act which permitted the United States to file a declaration of taking and deposit in the registry of the court the estimated compensation for the lands to be acquired.[10] The provisions of this enactment were so eminently fair that in the following year there was presented to Congress a similar bill to adopt the same procedure in condemnation cases outside of the District of Columbia. The letter of the Attorney General[11] which was adopted in the Senate report,[12] recites that with the exception of the power granted to the

---

[6] See Philadelphia Co. v. Stimson, 223 U.S. 605, 621, 622, 32 S.Ct. 340, 56 L.Ed. 570; note Ann.Cas.1918E, page 41 and cases cited.

[7] Kent's Commentaries, 13 Ed., 456 Note (f); Park v. Boston, 15 Pick. 198, 208.

[8] Act of July 2, 1917, 40 Stat. 241, 50 U.S.C.A. § 171.

[9] Act of July 18, 1918, 40 Stat. 911, 33 U.S.C.A. § 594.

[10] Act of March 1, 1929, 45 Stat. 1417, 40 U.S.C.A. § 370.

[11] Letter of William D. Mitchell, Attorney General, to Hon. George S. Graham, December 2, 1930.

[12] Calendar No. 1362, Senate Report No. 1325 to accompany H.R.14255, 71st Congress, 3d Session; January 5 (calendar day January 20) 1931.

Secretary of War in river and harbor condemnations, that there was no provision whereby any department head could "irrevocably commit the government to pay the ultimate award." The adoption of this statute simply carried out the expression of the Supreme Court in Hanson Lumber Co. v. United States, 261 U.S. 581, 587, 43 S.Ct. 442, 444, 67 L.Ed. 809, as follows:

"The owner is protected by the rule that title does not pass until compensation has been ascertained and paid, nor a right to the possession until reasonable, certain and adequate provision is made for obtaining just compensation. Cherokee Nation v. [Southern] Kansas R. Co., 135 U.S. 641, 659, 10 S.Ct. 965, 34 L.Ed. 295; Bauman v. Ross, 167 U.S. 548, 598, 599, 17 S.Ct. 966, 42 L.Ed. 270; Backus v. Fort St. Union Depot Co., 169 U.S. 557, 568, 569, 18 S.Ct. 445, 42 L.Ed. 853; United States v. Jones, 109 U.S. 513, 518, 3 S.Ct. 346, 27 L.Ed. 1015; Boom Co. v. Patterson, 98 U.S. 403, 406, 25 L.Ed. 206."

Thus there was placed on the statute books an enactment which provides adequate protection to the Government and the landowner. No formality is required except the signature of the Secretary of War on the declaration of taking. The provisions of the Declaration of Taking Act are extremely flexible. If too much money has been deposited and paid out to the landowner, the United States may recover it. If too little has been deposited, the United States must pay the deficiency. If too much land has been taken, the excess may be excluded if the landowner consents. If too little has been taken, the United States may condemn more. The Declaration of Taking Act, 40 U.S.C.A. § 258a, expressly provides:

"Upon the filing of a declaration of taking, the court shall have power to fix the time within which and the terms upon which the parties in possession shall be required to surrender possession to the petitioner."

The enactment is not mandatory in terms because in most instances the United States would not desire immediate possession. But the intention is plain that this procedure shall be used wherever possession was required prior to final judgment. Although thus permissive in form, this Act was in fact an addenda to the law of

August 1, 1888, and it is so codified since it appears as 40 U.S.C.A. § 258a, while the basic Act is 40 U.S.C.A. §§ 257, 258.

It is now contended that Congress by implication repealed this statute and provided another method of taking possession of land without the consent of the court, or the landowner, because of the exigencies of war. There are many reasons why this can not be true. In the first place, no necessity for such repeal existed since the procedure established gave the United States a right to file the declaration "with the petition."[13] Secondly, no such construction was indicated in the hearing of Congressional Committees and the history of the Act squarely shows the contrary.

In 1917, when the first World War came on, the series of statutes enacted by the various states, part of which permitted the immediate granting of possession by a court under appropriate security provisions, were in existence, but the power of the Secretary of War to pledge the money of the United States to the payment of any such award in condemnation proceedings, was seriously restricted by Section 355 of the Revised Statutes[13a] which required that the Attorney General should give an opinion as to the validity of title of any lands in which the United States sought to acquire an interest and likewise required the consent of the state in which the land was located. It was obvious that such provisions would hinder the war effort.

A statute[14] was passed relieving the Secretary of War from the burden of these provisions and permitting him to take immediate possession of any such lands notwithstanding such provisions. But it will be noted that such language is permissive only as to the restrictions, and that no court is required by such statute to grant immediate possession since "such proceedings to be prosecuted in accordance with the laws relating to suits for the condemnation of property of the states wherein the proceedings may be instituted." The permissive character was stressed by Senator Chamberlain in the proceedings in the Senate on June 26, 1917, when he said relative thereto:

"The Bill proposes to extend the power that the government already has and further to give the authorities *permission* without question to take charge of the sites as

---

[13] City of Oakland v. United States, 9 Cir., 124 F.2d 959.

[13a] 50 U.S.C.A. § 175.

[14] Act of July 2, 1917, 40 Stat. 241, 50 U.S.C.A. § 171.

soon as proceedings are initiated in the court."[15]

That the Senate of that date had fully in mind the necessity of protecting the property owner from the encroachments of Government, may be discovered by reading a furious debate over another condemnation bill, the particular provisions of which failed of passage. This debate took place on July 9, 1917, in the midst of a war.[16]

When the Second War Powers Act,[16a] under which it is claimed that the seizure in this case can be justified, came on for hearings and debate in Congress, no contention was made or advanced that an extraordinary power of seizure of property was therein given to the military after the property was under the jurisdiction of the court by the filing of a condemnation proceeding. Indeed, it was expressly contended that this Act, which was an amendment for the purposes of revivifying the War Purposes Act of 1917 above referred to, did not give to the Secretary of War any authority which he had not already possessed by virtue of the first Act. It was said, expressly, that the chief purpose of the new law was to use the statute of August 1, 1888, as the basic provision upon which all condemnation actions were to proceed. A copy of this basic Act was incorporated in the Congressional Record[17] to emphasize the fact that the rights of property owners were protected since the taking was required to be "by condemnation under judicial process" and the courts of the United States were given jurisdiction of the property and the proceedings for such condemnation. In the House Report on this bill, it is said:

"Title II of the bill relates to the acquisition and disposition of real property and personal property located thereon. It extends the War Purposes Act of 1917, which applies only to the Secretary of War to apply also to the Secretary of the Navy, or any other officer or agency designated by the President.

    \*    \*    \*    \*    \*    \*

"This bill also enables the Government to meet the War emergency by permitting improvements to be made and occupancy to be effected without prior approval of title by the Attorney General. This is not presently the case. Section 355 of the Revised Statutes as amended now prohibits the expenditure of public money for the improvement of land until the approval of the Attorney General has been obtained as to the validity of title."[18]

The last paragraph represents the exact situation since the War Purposes Act of 1917 only suspended Section 355 during the emergency created by the First World War. A similar statement appears in the report of the Senate Committee on the Judiciary.[19] In the debate on the Senate floor, Senator O'Mahoney was asked the direct question as to whether the bill would permit a seizure of property, to which he replied that it had not occurred to him "that such interpretation would be placed on the provision."[20] These reports are based upon the representations of the Attorney General of the United States Francis Biddle where, at the hearings upon this law, he said:

"The amendment proposes that condemnation proceedings shall be in accordance with the Act of August 1, 1888. This is the basic act under which Federal condemnation proceedings are instituted and its requirement is merely that such proceedings be in accordance with the practice and procedure of the states to the extent that they may be applicable \* \* \*. The proposed bill also empowers an agency acquiring land by purchase or voluntary means of transfer, to occupy and improve such lands without prior approval of the title by the Attorney General. This eliminates the time-consuming restrictions imposed by Section 355 of the Revised Statutes which prohibits the expenditure of public money for improvement of lands until the Attorney General had approved the validity of the title."[21]

It is thus to be noted that the Attorney General of the United States, in presenting

---

[15] Cong. Record Vol. 55, Part IV, p. 4263; emphasis supplied.

[16] Cong. Record July 9, 1917, 65th Congress, 1st Session, Vol. 55, Part V, pages 4824 et seq.

[16a] Act of March 27, 1942, 56 Stat. 176, 50 U.S.C.A.Appendix § 632.

[17] Cong. Record, January 26, 1942, 77th Congress, 2d Session, Vol. 88, Part. I, page 628 et seq.

[18] House Committee Report No. 1765,

Vol. 1, House Misc. Reports, 77th Congress, 2nd Session, Page 6.

[19] Senate Report 989, 77th Congress, 2nd Session.

[20] Cong. Record, January 26, 1942, 77th Congress, 2nd Session, Vol. 88, Part. I, page 627.

[21] Hearings before the Committee on the Judiciary, House of Representatives, 77th Congress, 2nd Session on S.B. Serial No. 10.

this bill to a committee of the House of Representatives, did not advise that body of the secret intention to claim a right of seizure independent of the "judicial process". Nor did he claim that the court, which had jurisdiction of the property and the condemnation proceedings, could not condition the grant of immediate possession of the property to the government by requiring a deposit of the estimated "just compensation".

The majority have noticed the phrase:

"Upon or after the filing of the condemnation petition, immediate possession may be taken and the property may be occupied, used and improved for the purposes of this Act [this section and section 171 of Title 50] notwithstanding any other law."

This language was drawn from the War Purposes Act of 1917 which is Section 171 of Title 50, U.S.C.A. and which constitutes Section 1 of the present law which is claimed to be only a condensation thereof. The following excerpt from the former section shows that the language quoted above is taken almost verbatim. This language is:

"* * * upon the filing of a petition for the condemnation * * * immediate possession thereof may be taken * * * and the lands may be occupied and used for military purposes * * *."

The final phrase "notwithstanding any other law" of the Second War Powers Act, is given its true meaning and explanation by the words of Section 1 which immediately follow the last words of the excerpt just quoted from the 1917 Act. These words are:

"* * * and the provision of section 175 of this title, providing that no public money shall be expended upon such lands until the written opinion of the Attorney General shall be had in favor of the validity of the title, nor until the consent of the legislature of the State in which the land is located, has been given, shall be, and the same are hereby, suspended during the period of the existing emergency."

It was not clear from the context of the 1917 Act whether the word "such" in the above excerpt applied to lands in condemnation alone, or also to those acquired in other ways. The Act of 1942 clarifies the intention by splitting the clauses, above quoted, into two sentences, the first of which, quoted by the majority as above noted, related to condemnation proceedings, and the second of which dealt with other modes of acquisition. This sentence read:

"Property acquired by purchase, donation, or other means of transfer may be occupied, used and improved for the purposes of this section prior to the approval of title by the Attorney General as required by section 355 of the Revised Statutes, as amended."

The purpose of these provisions in the 1917 and 1942 Acts is then plain. If the Secretary of War had to wait in time of war until the Attorney General had approved the title for every piece of land taken, the war effort might be considerably hindered. But if, without waiting for such clearance, the Secretary of War, who had an available appropriation, could accept possession granted by the court under the state procedure according to the statute of 1917, or under either the state procedure or under the Declaration of Taking Act, according to the statute of 1942, no hinderance or delay is discernable. The intention of allowing possession to be accepted without regard to the restrictions of Section 355, Revised Statutes, is plain. The mere fact that the long phrase of the 1917 Act, above quoted, was telescoped into the words "notwithstanding any other law" can not be conceived to indicate a broad and sweeping change of policy such as would be involved by permitting an agency, such as the military, to seize possession of property against the owner's will after a petition for condemnation had been filed. Especially is this true when the history of the progress of these Acts is considered.

Thus it is seen that Congress has followed a consistent policy of legislation since the enactment of the general condemnation statute of August 1, 1888, of requiring the Secretary of War to acquire land by the judicial process. There has been a marked intention to require the United States to submit itself to the jurisdiction of the courts in the acquisition of land. This intention is emphasized in the very sentence of the Act under which the military claims to act. The permission to take immediate possession, free of previous restrictions, is granted only "upon or after the filing of the condemnation proceeding", and the attachment of the jurisdiction of the court. It is difficult to understand, even with the sentence torn from the context and isolated from its history, how a construction could be conjured up which would confer upon an independent agency power

to seize property thus placed under the jurisdiction of the court in defiance of the order thereof. Therefore, the resume of the legislation shows that after the filing of a condemnation proceeding, the only method by which the possession of land can lawfully be obtained by the United States, is under court order. It must be concluded that such a court order granting or confirming possession, can be conditioned to require the Government to deposit estimated just compensation.

From the above considerations, it will be seen that there is nothing in the record to show that the United States is legally in possession of this land, or on the other hand, that the United States is in possession of the land at all, and if we are to make any assumptions we must assume certain of its agents are in possession of the land, using it for the purposes of the Government, but without right and tortiously.

Even if the United States were illegally in possession of this property, no remedy could be granted against it nor could it be required to vacate the premises.[22] It would violate the established concepts of our law to hold the sovereign in contempt of its own court or of itself. But the immunity of the sovereign does not extend to the agents or officers of the Government. If the United States were holding the property illegally, the court might sustain an action for ejectment against such officers and agents. United States v. Lee, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171.

This remedy is available where the land is occupied under claim of right by officers of the United States Army with soldiers, as a fort or army post.[23] If an agent of the United States has occupied or destroyed property illegally, even though he claims to act in the interest of the United States and by direct order, he may be held liable in damages.[24] Where the validity of the Act permitting the taking of land, and the authority of the officers to act thereunder, are conceded, no injunction will issue because there is an adequate remedy at law.[25] But where, as here, there is no concession that the alleged construction of the Act is valid, and no concession that the agents have authority to act thereunder, the court may

examine the question and issue injunction if necessary to protect the landowner or Merchants.

"The exemption of the United States from suit does not protect its officers from personal liability to persons whose rights of property they have wrongfully invaded. * * * And in case of an injury threatened by his illegal action, the officer can not claim immunity from injunction process. * * * And a similar injury may be inflicted, and there may exist ground for equitable relief, when an officer, insisting that he has the warrant of the statute, is transcending its bounds, and thus unlawfully assuming to exercise the power of government against the individual owner, is guilty of an invasion of private property." Philadelphia Co. v. Stimson, 223 U.S. 605, 32 S.Ct. 340, 344, 56 L.Ed. 570.

Likewise, since the United States has already submitted possession of this property to judicial control, and the jurisdiction of the court, the power to force restoration of the divested property and obtaining security for the payment of the judgment in the condemnation proceeding under pain of contempt, still exists.[26] The only reason the court here should now affirm the trial court for refusal to hold Sherman B. Green and Major Tiedeman in contempt, is that the court had apparently no proof before it that these individuals were at the time withholding possession. Nor were they shown to have been in actual resistance of process.

Of course, any order of the court can be resisted by the military by force. It would seem, however, that the Secretary of War might well adopt the suggestion of the majority, reaffirm his former position and require that the possession of the Government should be confirmed by court order. The most efficacious method of ratifying the action of the agents of the Army who took possession, is by filing a declaration of taking, as the majority suggest, and by depositing estimated just compensation from the existing appropriation for the interest which is taken. Such action would solve the questions in the condemnation case and bind the Government to the payment of the just compensation so assessed.

[22] See Hijo v. United States, 194 U.S. 315, 322, 24 S.Ct. 727, 48 L.Ed. 994.

[23] United States v. Lee, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171; Meigs v. M'Clung's Lessee, 9 Cranch 11, 18, 3 L.Ed. 639.

[24] New York Telephone Co. v. United States, 2 Cir., 136 F.2d 87.

[25] Hurley v. Kincaid, 285 U.S. 95, 103, 104, 52 S.Ct. 267, 76 L.Ed. 637.

[26] Cf. Lamb v. Cramer, 285 U.S. 217, 52 S.Ct. 315, 76 L.Ed. 715.

338

This would solve all of the questions as to whether the United States is actually in possession and as to whether it is legally in possession. All of the interests of the Government are now protected no matter what action is taken. The Secretary of War might well, therefore, assure Merchants of the payment of just compensation in this proceeding. Any other action looking toward the result arrived at in Moody v. Wickard, supra, would seem immoral. Such action would ratify the taking of possession of this property by the agents and thus purge them of any contempt.

The failure of this court to give a proper instruction leaves the way open for the trial court to order the agents of the United States to vacate the premises and to assess them personally in contempt for the holding thereof. There is no doubt that the property is being used for the benefit of the United States, and a result so fraught with litigation should be avoided. Whenever the United States seeks, under the judicial process, to condemn land of which its agents have taken possession, rightfully or wrongfully, proper assurance should be given that just compensation as of the date of taking will be paid in the direct proceeding.